**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| IN RE: | CASE NO. 25-20199-SMG |
|---|---|
| MVP GROUP, LLC, | CHAPTER 11 |
| Debtor. | |

**SWORN DECLARATION OF MICHAEL BROMBERG**
**IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS**

MICHAEL BROMBERG, under penalty of perjury, declares as follows (the "Sworn Declaration"):

1.      My name is Michael Bromberg.

2.      I am an adult resident of the State of Florida and the majority owner and sole manager of MVP Group, LLC (the "Debtor").

3.      This "Sworn Declaration" is being provided in support of the Debtor's Chapter 11 filing, commenced on August 28, 2025, including, without limitation, in support of any first day motions (collectively, the "First Day Filings") filed by the Debtor.

4.      Unless otherwise noted herein, this Sworn Declaration is based on my own personal knowledge.

**BACKGROUND**

*A.*      *Organization*

5.      The Debtor's predecessor first originated in Montreal, Canada in 1980 and operated under the name, MVP Group Corp.

6.      The Debtor organized in Florida, in 2012, as MVP Equipment Group, LLC.  While operating in the United States. MVP Group Corp provided inventory procurement and management until its dissolved operations in early 2025.

7.      In 2015, the Debtor changed its name to MVP Group, LLC and continues to operate all aspects of the business operation.

**B.**      ***Overview of Operations***

8.      The Debtor is an industry leading foodservice equipment manufacturer and distributor of commercial kitchen equipment.

9.      The Debtor's products are sold under 9 proprietary trademarked brands, including refrigerator units and merchandizing displays, freezers, convection ovens, gas ranges, dishwashing equipment, mixers, and slicers.

10.      All products are manufactured in China, Taiwan, Italy, and Portugal except for 1 product line that is manufactured in the United States. The time between submitting a purchase order for product manufactured outside the United States and deliver is approximately 90 days.

11.      The Debtor sells products through wholesalers throughout the United States, the Caribbean, and Central and South America. The Debtor also sells through its own commissioned and salaried employees.

12.      For the most part, the Debtor sells to dealers and wholesalers who carry the Debtor's product lines. However, the Debtor sells refrigeration and cooler products to grocery and convenience store chains directly, and one of the Debtor's brands can be found in 1,000 locations of an international hotel chain.

**C.**      ***Headquarters and Warehousing***

13.      The Debtor is headquartered and operates from leased premises located at 3560 NW 56th Street, Fort Lauderdale, Florida 33309.

14.    The Debtor is also a party to an inventory management and warehousing services agreement pursuant to which inventory is received, inspected, and stored at, and shipped to customers from, a facility located in the state of Indiana.

**D.    *Employees, Payroll and Benefits***

15.    The Debtor has 16 employees. A breakdown is as follows:

| *Department* | *Total* |
|---|---|
| Executives | 2 |
| Sales & Marketing | 3 |
| Technical Staff | 2 |
| Accounting Admin. & Support | 3 |
| Operational Admin. & Support | 3 |
| Logistics | 1 |
| Warehouse | 1 |
| Customer Service | 1 |
| *Total* | *16* |

16.    The Debtor uses ADP for payroll processing and payment of taxes and other withholdings. The Debtor is current on payroll taxes to the best of my knowledge, information, and belief.

17.    Employees are paid bi-weekly, and all payroll is deposited directly into the employee designated accounts. The next payroll is due to be direct deposited on August 29, 2025, for the 2-weeks ending August 22, 2025.

18.    The Debtor offers a 401-K plan with no matching contributions. Participation is voluntary and contributions are payroll deducted. The Debtor also offers medical insurance and pays 80% of the premiums. Employees pay the remaining 20% through payroll deductions. Finally, the Debtor offers paid vacation benefits commencing 6 months after employment, as well as 5 days of paid time off, annually.

19.     Finally, the Debtor also has an agreement with a third-party provider pursuant to which the Debtor utilizes the services of 3 individuals located outside the United States. These individuals provide customer service, and each provide 40 hours per week. The Debtor pays the third-party provider pursuant to invoices provided monthly.

**E.**     ***2024 and 2025 Financials***

20.     For the year ended December 31, 2024, the Debtor had total revenues of approximately $15,000,000.00. For the year ended December 31, 2025, the Debtor projects total revenues of approximately $15,000,000.00. The Debtor projects positive EBITDA for 2026.

**F.**     ***Debt Financing***

21.     To finance operations, the Debtor entered a revolving line of credit with Austin Financial Services, Inc. ("AFS") in the original amount of $10,000,000.00. AFS is currently owed approximately $2,696,880.65 (the "AFS Claim").

22.     Upon information and belief, AFS holds a duly perfected, first lien against substantially all the Debtor's assets, including, without limitation, accounts, equipment, and inventory (the "AFS Lien").[1]

23.     The Debtor believes that AFS is oversecured by a 2:1 ratio.

24.     Prior to the Petition Date, the Debtor and AFS utilized a deposit account with Wells Fargo bank (the "WF Account"). Collections were either deposited or transferred to the WF Account, which were then swept by AFS. AFS would then advance based on a borrowing base certificate calculating eligible accounts receivable and inventory. Funds were then advanced to the Debtor's general operating account at Bank of America.

---

[1] The Debtor reserves all objections, claims, defenses, and other rights with respect to AFS and the AFS Claim, including, without limitation, any rights to challenge AFS Lien.

25.     The Debtor also entered a loan transaction with Libertas Funding, LLC ("Libertas") in the original amount of $1,317,106.00. As of June 30, 2025, the outstanding balance was $1,173,779.00 (the "Libertas Claim").

26.     Upon information and belief, the Libertas Claim is secured by a duly perfected lien against the Debtor's accounts (the "Libertas Lien")[2], which is likely subordinated to the AFS Lien.

## G.    Assets

27.     As of August 28, 2025, the Debtor's assets include, but are not limited to, account receivables and inventory in the amounts of $1,353,672.86 and $4,023,232.60, respectively.

## H.    Unsecured Claims

28.     As of the Petition Date, the Debtor estimates unsecured claims in the amount of $6,700,000.00

## EVENTS LEADING TO BANKRUPTCY

29.     The Debtor has operated continuously for approximately 13 years. While the Debtor continues to enjoy strong brand name recognition and loyalty, as well as stable, quality vendor relationships, several factors outside the Debtor's control negatively impacted the Debtor's operations over the past couple of years.

30.     *First,* the Debtor had to switch production factories for one of its renowned brands due to a supply chain crisis in 2022. This forced switch ultimately led to delays in production, and the Debtor had no choice but to switch to another producer. Then, a substantial amount of delivered products fell below the Debtor's quality standards and led to a rejection of goods.

---

[2] The Debtor reserves all objections, claims, defenses, and other rights with respect to Libertas and the Libertas Claim, including, without limitation, any rights to challenge the extent, validity, and/or priority of the AFS Lien and/or Libertas Lien.

31.    *Second,* the Debtor experienced quality issues with another producer of products that led to the cancellation of some orders in 2023.

32.    Although these events were outside the Debtor's control, the cumulative effect had an undeniable impact on the Debtor's operations.

33.    Consequently, the Debtor undertook an internal restructuring, including a reduction in management headcount, the outsourcing of customer service, and a reduction of warehousing service locations.  This streamlining of operations led to significant cost savings.

34.    While management's efforts ameliorated the situation, the Debtor resolved to file for Chapter 11, in part, to restructure accumulated debt and debt service requirements, so that the Debtor may continue providing quality products and maintain its substantial relationships  with customers and vendors.

35.    Based on the Debtor's strong brand recognition and established relationships with customers and vendors, the Debtor is confident a Chapter 11 restructuring will enable the Debtor to emerge stronger and healthier.

## FIRST DAY FILINGS

36.    The Debtor intends to file several First Day Filings.

**_A._**    **_Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral_**

37.    The Debtor shall seek authorization to use cash collateral on interim and final basis.

38.    The Debtor shall seek interim relief to use cash collateral to pay for those expenses necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

39.    AFS and Libertas (collectively, the "Lenders") appear to hold recorded liens against the assets owned by the Debtor. There are two UCC-1s recorded with the Secretary of

State using third party agents and, therefore, the Debtor reserves all rights with respect to these liens (collectively, the "Liens").

40.     Each of the Liens extend to "accounts" and, therefore, the extent of such Liens in accounts may be at issue, as well as the priority and secured status of such Liens, particularly the later recorded Lien. It appears that AFS holds a first lien against accounts and that Libertas may hold an unsecured claim as a result of holding the later recorded lien.

41.     Nevertheless, the Liens may extend to collateral representing cash collateral within the meaning of 11 U.S.C. § 363(a).

42.     It is essential to the Debtor's continued operation that the Debtor have the ability to use cash collateral.

43.     Again, AFS appears to hold a first, priority lien against the Debtor's assets, including, without limitation, accounts receivable and inventory. The estimated values of the Debtor's account receivables and inventory are $1,353,672.86 and $4,023,232.60, respectively. Therefore, the Debtor believes that adequate protection will be provided to AFS as a result of the equity cushion in the AFS collateral.

44.     Notwithstanding the equity cushion, if necessary and required, the Debtor will propose continuing and/or replacement liens, if necessary and appropriate, in favor of AFS. The collateral securing the AFS claim has an estimated value of approximately $5,400,000.00, and the AFS claim is less than $2,700,000.00. However, the Debtor reserves all rights under section 552 of the Bankruptcy Code. Finally, the Debtor projects (a) collected revenue of approximately $610,000.00 and expenses of approximately $437,000.00 for the initial 21-day period, and (b) collected revenue of approximately $3,548,000.00 and expenses of approximately $3,100,000.00 for the initial 13-week cycle.

45.     As Libertas appears to hold a junior Lien against accounts receivable, the claim of Libertas may be entirely unsecured, as there may be no equity in the accounts receivable beyond the amount of the AFS claim.

**_B._**    **_Emergency Motion for Entry of Order (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (B) Deeming Utility Providers Adequately Assured of Future Performances, and (C) Establishing Adequate Assurance Procedures With Respect to Utility Providers_**

46.     In the course of the Debtor's business operations, the Debtor uses utilities, including electricity, internet, and trash removal (collectively, the "Utilities").

47.     The aggregate monthly billings for the Utilities are approximately $1,800.00 based on the past 90-day average prior to the petition date.

48.     It is my understanding that this motion is necessary to avoid any disruption of the Utilities.

**_C._**    **_Emergency Motion for Order Authorizing Continued Use of Existing (A) Cash Management System and Bank Account, and (B) Business Forms_**

49.     Prior to the Petition Date, collections and payments would be transferred to or deposited into a control deposit account at Wells Fargo.

50.     AFS would sweep the Wells Fargo account and then advance funds to the Debtor's general operating account at Bank of America based on a borrowing base certificate and eligible accounts receivable and inventory.

51.     Following the Petition Date, collections and payments shall be deposited directly to Bank of America (and the debtor-in-possession account to be opened by the Debtor). The Debtor is requesting authorization to continue using the account at Bank of America pending the opening of a "debtor in possession" account.  If the Debtor is not authorized to use the Bank of America

account, the disruption could cause irreparable damage to the Debtor's operations stemming from the inability to pay operating expenses.

52.     Additionally, the Debtor uses business forms without any reference to "debtor in possession" status or case number.  The Debtor is requesting authorization to continue using these business forms.

53.     Absent authorization, the Debtor would be required to use new forms, which would disrupt the Debtor's business operation, as the Debtor uses purchase orders and invoices.

**D.     _Emergency Motion for an Order Authorizing the Debtor to Pay Prepetition Wages, Taxes, and other Required Withholdings, and to Pay and Offer Continued Benefits_**

54.     The Debtor's employees are a critical part of the Debtor's business operations.

55.     It is very important that the Debtor be authorized to continue paying employees, withholdings, and to offer and pay continued benefits.

56.     The Debtor pays employees bi-weekly (every 2 weeks). Payroll is processed through ADP, which also pays payroll taxes and other withholdings.

57.     The most recent payroll was for the period August 11, 2025, through August 22, 2025, and was direct deposited into the employee designated accounts on August 29, 2025. The next payroll is for the period August 25, 2025, through September 5, 2025, and is to be paid on September 12, 2025 (the "Current Payroll"). The Current Payroll includes five (5) post-petition days. No employee exceeds the priority amount under section 507(a)(4) of the Bankruptcy Code, inclusive of salary, commissions, and benefits.

58.     Additionally, the Debtor offers medical insurance to full-time employees. The Debtor covers 80% of premiums. Dependent and family coverage is available but paid for entirely by employees.

59.     Full-time employees are afforded (a) paid time off ("PTO") at the rate of five (5)

days per year, and (b) one-week vacation after six (6) months, and two (2) weeks in the first full year.  Unused vacation days carry over to the next year.

60.    The Debtor also offers full-time employees the option of contributing to a 401-K plan. All contributions are voluntary, and the Debtor does not offer matching contributions.

61.    Occasionally, but not often, an employee or agent will incur an expense on a personal credit card. Requests for reimbursement and receipts are generally provided to a manager, who, if approved, will send the request for reimbursement to accounting.

**E.    Emergency Motion for Entry of Order Designating and Approving Notice Procedures**

62.    The Debtor has over 400 unsecured creditors (collectively the "Unsecured Creditors").

63.    The Unsecured Creditors hold scheduled claims[3] broken down as follows: (a) 126 less than $500.00; (b) 98 greater than $500.00 but less than or equal to $1,000.00; and (c) 85 greater than $1,000.00 but less than or equal to $2,000.00.

64.    Accordingly, 309 Unsecured Creditors hold scheduled unsecured claims less than or equal to $2,000.00.

65.    I am advised that in Chapter 11 cases having more than seventy five (75) parties of record, a party responsible for service may, *in lieu of service on all parties of record*, or must, if required by the Court or the Local Rules otherwise direct, serve the following parties (collectively, the "Master Notice Parties"): (a) the United States Trustee; (b) the Debtor; (c) counsel for the Debtor; (d) any indenture trustees; (e) any appointed statutory committee under section 1102 of the Bankruptcy Code and, before the appointment of any such committee, the list of twenty (20) largest unsecured creditors; (f) secured creditors; (g) the United States and its agencies as required under Bankruptcy Rule 2002(j); (h) those parties requesting notice in

---

[3] This Motion is filed without prejudice to the Debtor's rights to object to any Unsecured Claims.

writing or filing a notice of appearance; (i) any examiner or trustee appointed in the Chapter 11 case; and (j) any parties and entities (including governmental units) previously known to the Debtor to have a particularized interest in the subject of the notices required to be served.

66.      I am advised that Local Rule 2002-1(H)(3) provides that, except as otherwise provided by the Court, Local Rule 2002-1(H)(1) shall *not* apply to notices of the following (the "Critical LR Events"): (i) notice of commencement of the Chapter 11 case and of the 341 meeting of creditors; (ii) proposed, sale, or lease of property outside the ordinary course of business; (iii) time fixed for filing objections to the disclosure statement and notice of the disclosure statement hearing; (iv) time fixed for filing objections to confirmation and notice of the confirmation hearing; (v) notices of hearing on the dismissal or conversion of the case; and (vi) notice of entry of an order confirmation a plan.

67.      Finally, I am advised that, in addition to the Critical LR Events, Bankruptcy Rules 2002(a), (b), and (f) provide notice of the following must also be provided to all creditors (the "Critical BR Events" and, collectively with the Critcal LR Events, the "Critical Notice Events"): (i) notice of the deadline for filing proofs of claim; (ii) notice of hearing on any request for compensation and reimbursement of expenses in excess of $1,000.00; and (iii) notice of hearing on any approval of compromise or settlement (unless, the Court, for cause, orders otherwise).

68.      In order to save substantial costs associated with copying and postage, the Debtor is requesting approval of the following notice procedures (collectively, the "Notice Procedures"):

    (a)      Copies of all pleadings and notices shall be provided to the Master Notice Parties; and

    (b)      All creditors shall be provided with pleadings and notices pertaining to the Critical Notice Events.

69.     If the Notice Procedures are approved, it is my belief that the Debtor and the estate will benefit from reduced costs.

*F*.     ***Critical Vendor Motion***

70.     It is my understanding that the Debtor may request authorization to pay certain pre-petition claims held by critical vendors.

71.     It is the Debtor's intention to file a motion requesting authorization to pay certain critical vendor claims.  These claims include, but are not necessarily limited to, commissions and rebates owed to certain sales agents, customs claims, service claims relating to equipment repairs, and product manufacturer claims.

72.     The payment of these claims may be necessary to the Debtor's restructuring efforts.

73.     The Debtor reserves the right to add to and/or eliminate claims from its request.

## CONCLUSION

74.     This Sworn Declaration explains the circumstances leading to the filing of this Chapter 11 case and the bases in support of the relief requested in the First Day Filings.

75.     I believe that approval of the relief requested in the First Day Filings will benefit the Debtor, the estate and its creditors, and will ultimately facilitate a successful reorganization.

76.     The Debtor reserves all of its rights under applicable law, including, without limitation, the Bankruptcy Code and Bankruptcy Rules.

### Declaration – 28 U.S.C. § 1746

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 2, 2025

*/s/ Michael Bromberg*
Michael Bromberg
